Filed 6/1/15  Pala Band of Mission Indians v. County of San Diego Dept. of Environmental Health CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| PALA BAND OF MISSION INDIANS et al., | D063635/D063636 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. Nos. 37-2011-00055344-CU-MC-NC & 37-2011-00057673-CU-MC-NC) |
| COUNTY OF SAN DIEGO DEPARTMENT OF ENVIRONMENTAL HEALTH et al., | |
| Defendants and Respondents; | |
| GREGORY CANYON LTD., | |
| Real Party in Interest and Respondent. | |

APPEALS from a judgment of the Superior Court of San Diego County, Robert P. Dahlquist, Judge.  Affirmed.

Procopio, Cory, Hargreaves & Savitch and Walter E. Rusinek for Plaintiff and Appellant Pala Band of Mission Indians.

Delano & Delano and Everett L. DeLano III for Plaintiff and Appellant Riverwatch.

Natural Resources Defense Council, Joel Reynolds and Damon Nagami for Plaintiff and Appellant Natural Resources Defense Council.

Allen Matkins Leck Gamble Mallory & Natsis, Patrick E. Breen, Heather S. Riley; Lounsbery Ferguson Altona & Peak, Kenneth H. Lounsbery and Jacqueline S. Vinaccia for Defendants, Respondents, and Real Party in Interest.

These appeals are the latest in a long course of litigation arising after the voters' 1994 approval of Proposition C, an initiative that paved the way for the construction and operation of a privately owned Class III landfill and recycling collection facility in northern San Diego County (the Project).[1]  In the underlying action, the Pala Band of Mission Indians (Pala), the Natural Resources Defense Council and Riverwatch (collectively plaintiffs)[2] challenged the adequacy of the environmental review conducted by the San Diego County Department of Environmental Health (DEH) and its director, Jack Miller (together defendants), prior to issuing a solid waste facility permit (SWFP) for the Project to real party in interest Gregory Canyon Ltd. (GCL).[3]

---

[1]    This court heard argument of these two appeals together and now consolidate the appeals for purposes of disposition.

[2]    Sierra Club was also a plaintiff in the underlying actions, but is not a party to these appeals.

[3]    During the pendency of these proceedings, GCL's corporate status was suspended as a result of its failure to comply with applicable requirements and plaintiff brought a motion to disqualify it from participating in this appeal.  As GCL has since corrected this defect, we deny the disqualification motion as moot.

2

On appeal, plaintiffs assert (1) the DEH failed to comply with the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq. (CEQA))[4] when it prepared an addendum to the existing environmental impact report (EIR) rather than a supplemental environmental impact report (SEIR) relating to changes in the Project's proposed water sources and its impacts on fire and emergency services; (2) the addendum did not satisfy the informational requirements of CEQA as to the Project's proposed water sources and impacts on fire and emergency services; and (3) the trial court erred, as a matter of law, in declining to address their claim that the DEH's issuance of the SWFP violated the California Integrated Waste Management Act (§ 40000 et seq. (the Waste Act)) and Proposition C on exhaustion grounds. For reasons we shall explain, we affirm the judgment of the trial court.

FACTUAL AND PROCEDURAL BACKGROUND

Despite the passage of Proposition C in 1994, plans for development of the Project proceeded slowly in the intervening years as a result of repeated legal challenges. (See, e.g., *Pala Band of Mission Indians v. County of San Diego* (1998) 68 Cal.App.4th 556; *Pala Band of Mission Indians v. Board of Supervisors* (1997) 54 Cal.App.4th 565.) The DEH finally certified a final environmental impact report for the Project in February 2003 (the 2003 FEIR), issued a proposed SWFP for the Project in June 2004 and approved the Project as beneficial despite its significant and unavoidable environmental

_____

[4] All further statutory references are to the Public Resources Code except as otherwise indicated.

3

impacts on air quality, aesthetics, ethnohistory and Native American interests, traffic and circulation, and noise and vibration, in October 2004. (*RiverWatch v. Olivenhain Municipal Water Dist.* (2009) 170 Cal.App.4th 1186, 1195.) With the concurrence of the California Integrated Waste Management Board, the DEH issued a final SWFP for the Project in December 2004.

In the meantime, plaintiffs filed a petition for writ of mandate challenging DEH's approval of the proposed SWFP as violative of applicable regulations and contending that the Project, as approved in the 2003 FEIR, violated CEQA, the San Diego County general plan and Proposition C. In October 2005 the superior court granted plaintiffs certain relief, including insofar as they claimed that the 2003 FEIR improperly failed to consider water sources for the construction and operation of the Project, as well as the impacts of obtaining water from off-site sources.[5] The court ordered the DEH to set aside its certification of the 2003 FEIR and related decisions, including its approval of the

---

5      It was anticipated that GCL would operate the landfill for 30 years, utilizing a maximum of 193 acre feet of water per year during the time that the landfill was being both constructed and operated and 38 acre feet of water per year once construction was completed for dust control, landscape irrigation, fire protection and other purposes. (*RiverWatch v. Olivenhain Municipal Water District, supra*, 170 Cal.App.4th at p. 1195, fn. 2; *Riverwatch v. County of San Diego Department of Environmental Health,* (March 30, 2010, D054471) [nonpub. opn.], pp. 3, 14.) The 2003 FEIR concluded that these maximum demands could be met from the use of existing wells located on the Project site and that because these needs were less than the amount of water historically taken from the wells for dairy farming (approximately 465 acre feet per year), there would be no significant depletion of groundwater supplies resulting therefrom. The superior court found that the 2003 FEIR was inadequate because, at that time, GCL did not have a permit to pump water from the wells and the 2003 FEIR did not include any "meaningful discussion" of alternative water sources for the Project. (*RiverWatch v. Olivenhain Municipal Water District, supra*, 170 Cal.App.4th at p. 1195.)

4

proposed SWFP. (*RiverWatch v. Olivenhain Municipal Water Dist., supra,* 170 Cal.App.4th at p. 1196.)

After further analysis and public comment, the DEH certified a May 2007 revised final EIR (the RFEIR), which set forth an updated environmental review of the Project's impacts on various resources, including water supply. The RFEIR incorporated a revised liner design for the landfill and relied on a contract whereby the Olivenhain Municipal Water District (OMWD) agreed to supply up to 230 acre feet per year of recycled water as the primary water source for the Project for a 60-year term.[6] It also included the seven existing wells described in the 2003 FEIR as a secondary source of water.

In June 2007 defendants filed a motion to discharge the pending writ of mandate based on the DEH's certification of the RFEIR. The superior court denied the motion after concluding that the RFEIR did not sufficiently address the environmental effects, and impacts on current OMWD users, of having OMWD recycled water as the principal water supply source for the Project. However, it rejected plaintiffs' argument that the DEH had relied on "'inflated and internally inconsistent rainfall values'" in calculating the safe yield of the existing wells as a secondary water source. (*RiverWatch v. County of San Diego Department of Environmental Health* (March 30, 2010, D054471) [nonpub. opn.] p. 5.)

---

[6]     Under the contract, GCL was responsible for transporting the water from the OMWD facility to the Project site. (*Riverwatch v. Olivenhain Municipal Water District* (January 9, 2009, D052237) [nonpub. opn.] p. 3.) GCL estimated that this would require 89 truck trips per day. (*Ibid.*)

The DEH conducted further review of the Project's proposed water sources and their impacts, adopted a 2008 Addendum that set forth its analysis of those issues and recertified the RFEIR with the new addendum. In November 2008 the superior court upheld the sufficiency of these materials and granted defendant's renewed motion to discharge the writ of mandate. As the result of a separate action by Pala and RiverWatch challenging the OMWD's approval of the water supply contract as violative of CEQA, however, the OMWD voided its agreement with GCL in July 2009.[7]

Thereafter, GCL entered into a contract with the San Gabriel Valley Water Company (the SGVWC) to supply recycled water for "dust control, landscape irrigation, industrial uses and other activities" at the Project site. The SGVWC agreed to provide up to 75 acre feet per year of water for the Project through June 30, 2017, with the parties expressing their intent to extend the agreement's duration "to coincide with [the] SGVWC's extension or renewal" of the contract under which it received the recycled water from the County of Los Angeles Department of Parks and Recreation. The SGVWC contract provided that GCL would purchase the recycled water at the SGVWC's facility in El Monte, California, and be responsible for transporting it to the Project site.

Based on the changes to the water supply, the DEH prepared another addendum to the RFEIR (the 2009 Addendum). The addendum provided an updated report on the

---

[7]     Although the superior court rejected this challenge to the OMWD contract, this court reversed, concluding that the OMWD had not complied with its obligations as a responsible agency under CEQA. (*RiverWatch v. Olivenhain Municipal Water Dist., supra*, 170 Cal.App.4th 1186.)

6

Project's water demand, noting that two operational changes (the use of premoisturized clay for the landfill liner and the use of a chemical soil sealant for dust control) substantially reduced the water needs for the Project from the estimate that provided the basis for the 2003 FEIR and RFEIR.[8]

The 2009 Addendum also set forth an analysis of two new on-site sources of water to satisfy the Project's demand: (1) the riparian underflow of the San Luis Rey River and (2) percolating groundwater from multiple on-site watersheds. The 2009 Addendum attached an opinion letter from respondents' counsel analyzing GCL's legal rights to utilize riparian underflow for the construction, operation and closure of the landfill;[9] the analysis concluded that GCL had superior rights to pump water from the alluvial basin for use on the parcels that made up the landfill footprint, the ancillary facilities area and

[8]    The 2003 FEIR estimated a maximum demand of 193 acre feet per year of water (approximately 205,000 gallons per day), 125,000 gallons per day of which was for construction of the landfill liner. The 2009 Addendum indicated that the use of premoisturized clay would eliminate the need for water to construct the liner and that, combined with the use of a chemical soil sealant, would reduce the annual water needs for the Project to a maximum of 66,785 gallons per day (approximately 63 acre feet per year).

[9]    GCL's riparian rights are circumscribed by a 1913 deed that conveyed 41 separately described property tracts to its predecessor-in-interest. The deed reserved to the grantor the rights to build a dam, a reservoir and auxiliary structures on certain of the tracts It also provided that the conveyance of the property was subject to certain conditions, including that "water shall not be developed on the land hereby granted . . . by artesian or surface wells, or otherwise, to be used on other lands, or in excess of the requirements of the lands hereby granted, for irrigation, domestic and stock purposes; and if such development is made by said grantee, or by any other person, then and in that case the amount of water developed in excess of the requirements described in this agreement shall become the property of said grantor . . . ."

7

certain other portions of the Project site. Based on that analysis and a water usage assessment report that examined the availability of riparian underflow and where it could be used on the Project site under different operational scenarios, the 2009 Addendum indicated that the riparian underflow would provide approximately 21 to 99 percent of the Project's annualized water needs, varying depending on the phase of the landfill's construction and operation, throughout the life of the Project.

The 2009 Addendum also indicated that percolating groundwater from existing on-site wells (which had been estimated by the RFEIR to provide a safe yield of 38,880 gallons of water per day) could be used anywhere on the Project site and would be sufficient to meet the Project's remaining water needs unless there was lower rainfall over extended periods or there was a loss of acreage for percolation as a result of the installation of the landfill liner. It further identified three other watersheds on the Project property from which percolating water could be pumped for Project usage and, based on the same assumptions and methodologies used to calculate the safe yield of the existing wells, estimated a safe yield of 20,349 gallons per day from these potential sources.

Finally, the 2009 Addendum addressed the SGVWC recycled water contract as an alternative source of water needed to meet the Project's needs "on an occasional basis."[10] It acknowledged the contract's set expiration date of June 2017, but concluded that a number of factors (including the SGVWC's commitments to provide 2,000 acre feet per

_____

[10]    The recycled water contract provided that the SGVWC could provide up to 80,000 gallons per day (approximately 75 acre feet per year) of water to the Project.

8

year of water to all of its customers and its supplier's significant investment in infrastructure to convey recycled water to it) made it likely that the SGVWC would extend the contract; the addendum also noted the RFEIR's discussion of the substantial availability of recycled water from other sources within San Diego County. It also analyzed the potential environmental impacts (including on traffic, air quality, health risk and noise) of trucking recycled water from the SGVWC facility to the Project site.

After the DEH adopted the 2009 Addendum in January 2010, plaintiffs filed objections to the addendum, arguing, among other things, that it improperly analyzed GCL's riparian rights, failed to analyze the impacts of using pumped water for the Project and failed to consider the legality of the SGVWC's agreement to sell recycled water to GCL. They also contended that the issuance of a new consolidated county fire code in November 2009 required further analysis of the impacts of the Project on fire and related emergency services.[11]

In January 2011 GCL submitted a revised SWFP application for the Project. After a public hearing, the DEH determined that the application was "complete and correct" and accepted it for filing in February 2011. At about the same time, the San Diego County Fire Authority (County Fire) submitted its comments about the Project to the DEH, indicating that the "[P]roject will have a potentially significant impact on the

_____

[11] The DEH adopted a third addendum in May 2010 (the 2010 Addendum) to address concerns raised by the U.S. Army Corps of Engineers that construction of the Project might result in the placement of fill in waters subject to federal jurisdiction under the federal Clean Water Act (33 U.S.C. § 1344).

9

delivery of emergency fire suppression, fire prevention and EMS services . . . " and that it did not expect to have fire protection facilities adequate to serve the Project within the next five years, but hoped to have a "full service, staffed fire station in the area at some time in the future." County Fire specified that, in the interim, it would require GCL to participate in a community facility district or enter a developer agreement to mitigate the Project's impact on fire-related services.

In May 2011 the DEH adopted its original 2004 CEQA findings, together with revised CEQA findings that analyzed the changes to the Project, and the circumstances upon which the Project was undertaken, since certification of the RFEIR. Based on the CEQA documents relating to the Project, including the addenda and a table of detailed supporting information, the DEH determined that no SEIR was required. It found that the potential benefits of the Project outweighed and overrode the Project's significant and unavoidable impacts, certified the SWFP as consistent with the RFEIR and formally submitted the proposed SWFP to the California Department of Resources Recycling and Recovery (CalRecycle) for concurrence.

At CalRecycle hearings in June 2011, Pala unsuccessfully challenged the DEH's finding that the SWFP application was complete and correct. Plaintiffs also filed an action in the superior court challenging the DEH's approval of the SWFP application and the Project-related documents as violative of Proposition C and CEQA and seeking rescission of the SWFP on that basis. The lawsuit averred, in part, that (a) GCL did not have the right to use riparian water sources for the Project, could not legally obtain recycled water from the SGVWC and had not shown that it could obtain water from the

10

three proposed new wells and (b) the DEH failed to properly consider and analyze the impacts of the Project on fire safety and the impacts of using premoisturized clay to line the landfill. Plaintiffs also asserted that the DEH was required to prepare an SEIR.

In July 2011 CalRecycle adopted the DEH's CEQA findings and statement of overriding considerations and concurred with the issuance of the SWFP . The following month the DEH issued the SWFP and filed a notice of determination for the Project. Shortly thereafter, plaintiffs filed a second action challenging the DEH's issuance of the SWFP, asserting that the significant changes to the Project required the DEH to prepare an EIR and that the DEH's issuance of the SWFP was an abuse of discretion (and violated Proposition C and the Waste Act) because the SWFP did not impose certain operational conditions and restrictions on the Project.

Defendants responded in the actions by contending, in part, that plaintiffs' failure to administratively appeal the DEH's issuance of the SWFP to the Solid Waste Hearing Panel or CalRecycle barred them from seeking relief in court and that in any event the SWFP complied with CEQA and Proposition C. They also specifically argued that the 2003 FEIR adequately addressed the Project's potential fire safety impacts, that the County Fire letter did not change those impacts, and that the 2009 Addendum properly analyzed GCL's riparian rights, the propriety of the SGVWC recycled water contract and the uses of percolating water and premoisturized clay.

The trial court rejected plaintiffs' CEQA claims, ruling in part:

> "The [Project] has already been the subject of extensive environmental studies. A 'Final Environmental Impact Report' was issued in December 2002 and certified in February 2003. After

11

judicial review of that report, resulting in a judicial determination that additional study was necessary, a 'Revised Final Environmental Impact Report' was issued in March 2007. After additional judicial proceedings, three additional 'Addendums' were issued in July 2008, December 2009 and May 2010. The potential environmental effects of this proposed project have been extensively studied and analyzed for more than a decade.

"In light of the extensive studies that have already been conducted and in light of the burden on [plaintiffs] in this current proceeding, the Court believes . . . [it] somewhat unusual [that plaintiffs'] briefing largely ignores the substance of the two prior [EIR's], the three Addendums and the extensive record associated with those prior studies, and presents current challenges to the [DEH's] actions almost as if the parties and the Court were writing on a completely clean slate, with no prior record of any consideration of any potential environmental issues associated with the [P]roject.

". . . [Plaintiffs] are required to present 'all the material evidence' in the record pertaining to the matters that are now being challenged, and then show 'that there is not sufficient evidence in the record to justify the [DEH's] action.' . . . [¶] This Court believes that [plaintiffs] have failed to meet their burden in this regard. [Plaintiffs] have not fairly presented all material evidence in the record, and have failed to demonstrate that there is not sufficient evidence in the record to support the [DEH]'s decision.

"It is not the role of this Court to determine whether the construction and operation of the [Project] is a good idea. . . . The Court's role is to determine whether the decision-makers have been properly informed of the potential environmental consequences of their decision and have followed the law in making their decision. On this record, the Court concludes that [plaintiffs] have not met their burden of showing that there is insufficient evidence in the record to justify the [DEH's] actions."

After addressing each of plaintiffs' specific contentions in detail, the trial court

concluded that "on this record, the Court is not persuaded that [the DEH] has failed to

follow the mandates of CEQA in connection with the decisions that are challenged by

[plaintiffs]."

12

The court separately addressed plaintiffs' claims that the DEH's issuance of the SWFP violated Proposition C and the Waste Act. It found that plaintiffs had failed to exhaust their administrative remedies with respect to these claims and that it accordingly lacked jurisdiction to grant any of the relief they requested.[12]

The court entered judgment in favor of defendants and awarded them costs. Plaintiffs appeal.

DISCUSSION

I. *PLAINTIFFS' CEQA CLAIMS*

A. *CEQA Overview*

"The fundamental goals of environmental review under CEQA are information, participation, mitigation, and accountability." (*Lincoln Place Tenants Assn.* v. *City of Los Angeles* (2007) 155 Cal.App.4th 425, 443-444.) CEQA requires a public agency to prepare an EIR before approving a project that may have significant environmental effects. (§ 21100.) The EIR is "'the heart of CEQA'," an "'environmental "alarm bell" whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return.'" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 (*Laurel Heights*).) As the California Supreme Court has explained: "If CEQA is

---

12    The court also rejected plaintiffs' claim for declaratory relief, which sought a declaration that GCL was required to contribute its fair share of the costs of realigning State Route 76, on the ground that they had not submitted any evidence of an existing controversy. Plaintiffs do not challenge this ruling in these appeals.

scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. . . . The EIR process protects not only the environment but also informed self-government." (*Ibid*.)

Once an EIR is certified for a project, it is conclusively presumed valid unless a lawsuit is timely brought to contest its validity. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1130 (*Laurel Heights II*.) This presumption provides a balance against the burdens created by the environmental review process by according a reasonable measure of finality and certainty to the results achieved thereby, even if the initial EIR resulting from it is later discovered to have been "fundamentally inaccurate and misleading in the description of a significant effect or the severity of its consequences." (*Ibid*.; *San Diego Navy Broadway Complex Coalition v. City of San Diego* (2010) 185 Cal.App.4th 924, 935.)

For similar reasons, once an EIR is prepared for a project, the preparation of an SEIR is not required unless (a) there are substantial proposed changes to the project that require major revisions to the EIR, (b) there are substantial changes in the circumstances under which the project is being undertaken that require major revisions to the EIR or (c) new information that was not known and could not have been known at the time the EIR was certified as complete becomes available. (§ 21166; *Moss v. County of Humboldt* (2008) 162 Cal.App.4th 1041, 1049-1050 [indicating that under CEQA the issuance of an EIR flips the presumption from favoring environmental review to one "in favor of the developer and against further review" precisely because in-depth review has already

14

occurred and the time for challenging the sufficiency of the original EIR has long since expired]; see Cal. Code Regs., tit. 14 (CEQA Guidelines), § 15162.)[13]

Thus, while CEQA sets forth a low threshold requirement for the preparation of an EIR in the first instance, it prohibits agencies from requiring an SEIR unless one of the delineated conditions exists. (*River Valley, supra,* 37 Cal.App.4th at p. 167; see also CEQA Guidelines, § 15163, subd. (b) [allowing an SEIR to "contain only the information necessary to make the previous EIR adequate for the project as revised"].) When a lead agency is considering whether to prepare an SEIR, it is entitled to limit its consideration of the later project to effects not considered in connection with the earlier one (*Temecula Band of Luiseño Mission Indians v. Rancho Cal. Water Dist.* (1996) 43 Cal.App.4th 425, 437), with the fundamental question being whether circumstances have changed enough to justify repeating a substantial portion of the environmental review process. (*River Valley, supra,* at p. 167.)

---

[13] CEQA Guidelines section 15162 clarifies that an SEIR is required if project or circumstantial changes involve "new significant environmental effects or a substantial increase in the severity of previously identified significant effects." (CEQA Guidelines, § 15162, subd. (a)(1), (2).) It also specifies that new information will only warrant the preparation of an SEIR if it is "of substantial importance" and shows that: (A) the project will have one or more significant effects not discussed in the previous EIR or negative declaration; [¶] (B) significant effects previously examined will be substantially more severe than shown in the previous EIR . . . . (CEQA Guidelines, § 15162, subd. (a)(3); *Moss v. County of Humboldt, supra,* 162 Cal.App.4th at p. 1049; *Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1317.) Changes to a project that do not meet these standards are to be addressed in an addendum rather than an SEIR. (*River Valley Preservation Project v. Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154, 177 (*River Valley*).)

15

B.  *Standards of Review*

The courts review an agency's decision under CEQA to determine if (1) the agency failed to proceed in a manner required by law or (2) there was no substantial evidence to support its decision.  (§§ 21168, 21168.5; *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 945.)  Whether the agency failed to proceed in a manner required by law is a question of law, one that a court reviews de novo to determine whether the agency complied with CEQA's procedural requirements, including the requirement that an EIR set forth the information necessary to make a meaningful assessment of a project's environmental impacts.  (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 118 (*Save Our Peninsula*).)  The focus is on "adequacy, completeness, and a good faith effort at full disclosure" (*Santa Monica Baykeeper v. City of Malibu* (2011) 193 Cal.App.4th 1538, 1547), rather than on weighing conflicting evidence and determining who has the better argument, which a court has neither the resources nor the scientific expertise to undertake.  (*Laurel Heights, supra,* 47 Cal.3d at p. 392.)

As to the agency's factual findings and conclusions, a court accords greater deference to and will uphold those findings and conclusions that are supported by substantial evidence, even in the face of evidence showing that "'an opposite conclusion would have been equally or more reasonable.'"  (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 (*Vineyard*).)  For purposes of this review, substantial evidence may consist of "fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact."  (§ 21080, subd.

16

(e)(1); see also CEQA Guidelines, § 15384, subd. (a) [defining substantial evidence as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached"].) Unsubstantiated opinion or narrative or evidence that is clearly inaccurate or erroneous is not sufficient, however. (§ 21080, subd. (e)(2).)

    C. *Was the DEH Required To Prepare an SEIR*?

Plaintiffs assert that the DEH was required to prepare an SEIR rather than an addendum as a result of the cancellation of the OMWD water contract and the identification of three "new" sources of water for the Project because these constituted significant changes in the Project for which additional in-depth environmental review was required. As explained *post*, we find plaintiffs have not shown that the DEH erred in concluding that, based on the availability of alternative water sources sufficient to supply the needs of the Project, the loss of the OMWD water contract and resulting focus on other water sources for the Project did not constitute a significant change requiring major revisions to the RFEIR.

An environmental review of a project must include an analysis of the effects of providing water to the project and in some manner identify the planned sources of that water. (*Vineyard, supra,* 40 Cal.4th at p. 428.) A review that "simply ignores or assumes a solution to the problem of supplying water to a proposed land use" is inadequate to meet the informational requirements of CEQA. (*Vineyard,* at pp. 430-431.) Moreover, an environmental review for a project that is to be constructed and operated over a number of years cannot simply address the project's water supply requirements for the

17

first stage or first few years of the project's life, but must analyze, "to the extent reasonably possible," the impacts of providing water throughout the life of the project. (*Id*. at p. 431.) Finally, an environmental review must identify and analyze future sources of water that "bear a likelihood of actually proving available" (*id.* at p. 432) and, where that availability is impossible to definitively determine, it must also discuss the degree of uncertainty involved, as well as replacement or alternative sources and the environmental consequences of using those contingent sources. (*Id*. at p. 434.)

Plaintiffs argue that these principles require the preparation of an SEIR whenever *any* water source changes occur for a project. However, this broad assertion is clearly at odds with the statutory directive that the preparation of an SEIR is unnecessary (and in fact inappropriate) unless the lead agency determines that "[s]ubstantial changes" to the project require "major revisions" to the prior EIR. (§ 21166; CEQA Guideline, § 15162; see also *River Valley, supra,* 37 Cal.App.4th at p. 168.)

Plaintiffs' reliance on *Save Our Peninsula, supra,* 87 Cal.App.4th 99, as supportive of their argument is equally unavailing. In that case, *it was expressly undisputed* that any increase in water pumping from the alluvial aquifer above preproject levels would have an adverse and significant impact on the environment; further, the draft EIR set forth a baseline water usage for irrigation of the project property that was based on a representation by the project proponents despite the fact that there was no evidence showing the property had actually been irrigated on an historical basis. (*Id*. at pp. 118, 120-122.)

18

Concluding that CEQA required an EIR to set forth the existing environment as the baseline and include assessment of the impacts of a project "measured against the 'real conditions on the ground'" rather than hypothetical circumstances (*Save Our Peninsula, supra,* 87 Cal.App.4th at p. 121, quoting *City of Carmel-by-the-Sea v. Board of Supervisors* (1986) 183 Cal.App.3d 229, 246), the appellate court determined that the EIR's water supply discussion "suffer[ed] from a . . . lack of analysis" (*id.* at p. 131) and ordered the lead agency to prepare a revised EIR that discussed, among other things, actual water use based on documentation or good faith estimates of historical use, pumping histories, and an analysis of the project prononents' riparian rights (*id.* at p. 143).

*Save Our Peninsula* is legally and factually inapposite here.  As a fundamental matter, it did not involve the question of whether the lead agency was required to prepare an SEIR in response to a change in the circumstances of the project.  Moreover, unlike in this case, the analysis of the EIR in *Save Our Peninsula* was expressly dependent on a factual finding that was completely unsupported in the administrative record.  As that is not the situation here, *Save Our Peninsula* does not support plaintiffs' contention that an SEIR was required.

Plaintiffs have not shown that the DEH erred in preparing an addendum, rather than an SEIR, to address the changes in the sources of water for the Project.

19

D. *Did the 2009 Addendum Set Forth a Sufficient Analysis of the Proposed Water Sources for the Project?*

Plaintiffs also contend that not only was the 2009 Addendum an improper vehicle for addressing the changes in the planned water sources for the Project under CEQA, it also failed as an informational document under the analysis of *Vineyard*. (*Vineyard, supra*, 40 Cal.4th at pp. 432, 435). Specifically, they contend that the 2009 Addendum failed to adequately analyze the legal and physical uncertainties of obtaining water from the sources it identified and the impacts of obtaining water from off-site sources to premoisturize the clay for the landfill liner. However, as we shall discuss, *post*, substantial evidence in the record supports the viability of the water sources identified in the 2009 Addendum.

1. *Riparian water rights*

The 2009 Addendum updated the 2003 FEIR's discussion of riparian water rights. It included (a) a technical memorandum prepared by Geo-Logic Associates (Geo-Logic) analyzing the riparian status of GCL's property and mapping the extent of the alluvium against GCL's property boundaries and (b) a water usage assessment report by Kleinfelder & Associates, which examined five operational scenarios that were expected to occur over the life of the landfill and analyzed how much riparian underflow would be available, and where the riparian water could be used on the Project site, for each scenario.

The addendum also attached a legal memorandum from respondents' counsel that summarized applicable California law, analyzed the Project's chain of title documents,

20

and compared the parcel maps with Geo-Logic's alluvial boundary maps. The memorandum opined that GCL maintained riparian water rights on 14 (out of the 41) parcels and on a portion of a 15th parcel, thus establishing GCL's right to use riparian surface and subterranean stream waters on various parts of the Project site.

Although there is no contradictory expert evidence on the issue of GCL's riparian rights in the record, plaintiffs challenge the sufficiency of the foregoing evidence by contending that the 1913 deed, on its face, established that GCL had no right to use riparian waters at the Project site. They first point to the language of the deed specifying that the grantor reserved for itself and its successors and assigns "all the water, both surface and subterranean, of the San Luis Rey river and its tributaries above [the river's intersection] with the western boundary of the Monserrate Ranch" as a basis for contending that GCL's predecessor did not acquire any riparian rights relating to the Project property. However, plaintiffs provide no analysis of the extent of the property affected by this reservation.

Further, they disregard that, to the extent the grantor in this case reserved to itself the rights to water captured from the development of an upstream dam and reservoir and to on-site water that exceeded the grantee's water needs for irrigation, domestic and stock purposes, that reservation was at least in part appropriative in nature. (*Anaheim Union Water Co. v. Fuller* (1907) 150 Cal. 327, 332.) Because the grantor never constructed the dam or took other steps necessary to establish enforceable rights to appropriate water from the parcels on the Project site, those rights were lost and not transferable as part of a subsequent conveyance of the grantor's retained land. (See generally *Turlock Irrigation*

21

*Dist. v. Zanker* (2006) 140 Cal.App.4th 1047, 1054 [recognizing that the elements of a valid appropriation include an actual diversion or extraction of water and an application of the water to a beneficial use within a reasonable period of time].)

The legal memorandum analyzed this exact point, indicating that although the grantor under the deed reserved the rights to use water in excess of the needs of the property being conveyed and to build upstream facilities to export water from the watershed,

> "[*P*]*rior to 1914, one had to take water and beneficially use it to create an enforceable right to appropriate* [*it*]. *Once acquired, an appropriative right had to be maintained by continuous beneficial use of the water.* Water Code Section 1202[, subdivision] (b). [Counsel] is aware of no evidence, physical or anecdotal, that water was ever appropriated by [the grantor] (or anyone else) and put to beneficial use outside the Pala Basin, nor is there any evidence that any facilities were built to transport water from the Pala watershed. None of the subsequent grantees of this property have put restrictive language regarding water rights in the conveyance documents. Even if there were some appropriative rights to take water from the [Project site], they would be subordinate to riparian rights."

This legal analysis constitutes substantial evidence that GCL retained the right to use riparian or ground water on the tracts abutting or overlying those sources, so long as that usage was not in excess of the requirements of the land (as discussed more fully, *post*).

Plaintiffs cite *Duckworth v. Watsonville Water & Light Co.* (1910) 158 Cal. 206 (*Duckworth II*) as establishing that this language of the 1913 deed precluded GCL from using riparian or ground water for the Project. In *Duckworth II*, the grantor conveyed to one grantee her land and the right to water rights relating thereto as necessary for domestic use and watering stock and conveyed to another grantee all other water rights

22

relating to the property.  (*Id.* at pp. 212-214; see also *Duckworth v. Watsonville Water & Light Co.* (1907) 150 Cal. 520, 524.)  Thereafter the first grantee's successor claimed the right to divert riparian water to irrigate the land and the second grantee's successors objected.  (*Duckworth II, supra,* at p. 213.)  The California Supreme Court held that the first grantee could not use water to irrigate the land, on either a riparian or an appropriative basis, because the original conveyance did not reserve to the first grantee the right to use riparian water for irrigation.  (*Id.* at pp. 212-213.)

*Duckworth II* is not determinative as to the validity of GCL's riparian rights as to the Project site.  The *Duckworth II* grantor's transfer of water rights to the second grantee severed those rights from the property and were thus completely appropriative in nature (*Gould v. Stafford* (1891) 91 Cal. 146, 155) and there was no claim in that case that the second grantee had failed to take the steps to establish its appropriative water rights, as is true here.  Thus, *Duckworth II* does not support plaintiffs' theory that all of riparian water rights relating to the Project site were extinguished by the 1913 deed.

Plaintiffs also cite *Carlsbad Mutual Water Co. v. San Luis Rey Development Co.* (1947) 78 Cal.App.2d 900 for the general and unremarkable proposition that where a grantor transfers all water rights relating to its property subject to a reservation of the right to use riparian waters for "irrigation, domestic and other purposes" (*id.* at p. 904) on the land, the extent of riparian rights "must be measured by what was reserved or excepted by that clause."  (*Id.* at p. 910.)  Their reliance on this case is misplaced, however, as it offers no interpretation as to the meaning or scope of the reservation clause

23

at issue there. The *Carlsbad* decision does not support plaintiffs' claim that the 1913 deed extinguished the riparian water rights at the Project site.

For these reasons, plaintiffs have not shown that the 2009 Addendum's reliance on the existence of riparian water sources to partially supply the Project was erroneous. (*Citizens for a Megaplex-Free Alameda v. City of Alameda* (2007) 149 Cal.App.4th 91, 113; *River Valley, supra,* 37 Cal.App.4th at p. 168.)

Finally, plaintiffs argue in passing that the 2009 Addendum's failure to refer to or include the 1913 deed is fatal based on *Vineyard*'s admonition that "'information "scattered here and there in EIR appendices," or a report "buried in an appendix," is not a substitute for "a good faith reasoned analysis."'" (*Vineyard*, 40 Cal.4th at p. 442.) However, given that this Project is no longer in its initial environmental review stage and that the interests of finality are now favored over the policy of encouraging public comment, we cannot conclude that this omission renders the 2009 Addendum inadequate as an informational document. (*San Diego Navy Broadway Complex Coalition v. City of San Diego, supra,* 185 Cal.App.4th at p. 935.)

2. *Percolating groundwater from the existing wells and proposed Area 1 well*

Plaintiffs point to a second passage of the 1913 deed as restricting the use of percolating groundwater from the existing wells and the proposed Area 1 well. That passage provided:

> "water shall not be developed on the land . . . by the grantee . . . by artesian or surface wells, or otherwise, *to be used on other lands, or in excess of the requirements of the lands hereby granted, for irrigation, domestic and stock purposes*." (Italics added.)

24

Plaintiffs argue that the reservation of the right to use water for "irrigation, domestic and stock purposes" cannot be interpreted to include the use of water for the construction and operation of a landfill.

We question whether plaintiffs can now challenge the percolating groundwater from the existing wells as a water source for the Project, as they failed to appeal from the superior court's determination rejecting their objection to the RFEIR on that basis. (*Moss v. County of Humboldt, supra,* 162 Cal.App.4th at pp. 1049-1050.) Even if plaintiffs are not precluded from raising this issue, they have not shown that the 1913 deed prevented the use of water from either the existing wells or the potential well in Area 1 for the Project.

Changes to the Project (namely that water was no longer going to be used to build the landfill liner and that chemical sealants were going to be used instead of water for dust control purposes) appear to have substantially limited, if not eliminated, uses of the water that were outside the scope of what the 1913 deed allowed. In this regard, the 2009 Addendum recognized that 10,000 gallons per day of water would be used for "ancillary usage, landscape irrigation and fire protection," which fall well within the scope of "irrigation" and "domestic" uses. Plaintiffs have not shown that the proposed uses of riparian well water at the Project site are precluded by the 1913 deed.

3. *Groundwater from potential on-site wells in Areas 1, 2 and 3*

Plaintiffs assert that the 2009 Addendum improperly relied on groundwater from three potential bedrock wells because there is no "physical evidence" that groundwater could in fact be obtained from these sources. This assertion reflects a misapplication of

CEQA, which places the burden on *plaintiffs* to establish that the DEH abused its discretion in relying on the potential wells as a water source for the Project. (See *Laurel Heights II, supra*, 6 Cal.4th at p. 1130.) Moreover, substantial evidence in the record supports the DEH's conclusion that groundwater from these potential on-site wells was a reliable source of water for the Project.

The 2009 Addendum identified three watersheds within the Project site that had percolating groundwater accessible through the installation of one or more pumping wells. It recognized that a safe yield analysis was "the only method available to estimate the volume of available percolating groundwater, because wells have not been installed in these watersheds and no pump test data is available to perform the computer simulation to calculate the sustainable yield" of these resources. The Geo-Logic report analyzed the safe yield from these additional watersheds using the same assumptions and methodologies as were used for the existing wells discussed in the RFEIR, with adjustments to reflect the actual acreage of each watershed. Based on its expertise in geology and hydrology, Geo-Logic opined that the use of the calculated safe yield would provide a conservative estimate of the available percolating groundwater that could be pumped without a significant impact to that resource.[14] Plaintiffs have not shown that the 2009 Addendum's reliance on or discussion of this potential water source was inadequate.

---

[14] Geo-Logic also recommended "that each pumping well undergo a new pumping test on a bi-annual basis (every other year), the sustainable yield re-calculated . . . and the level controls re-set based on the results of the calculation of long term sustainable yield." The 2009 Addendum incorporated this recommended requirement.

4. *Recycled water*

Plaintiffs assert that the 2009 Addendum also improperly relied on recycled water from the SGVWC contract as a water source for the Project because it failed to consider restrictions on the SVGWC's ability to enter the contract under (1) the operative terms of the agreements by which the SGVWC obtained recycled water and (2) the regulatory requirements applicable to the SGVWC's sale of recycled water. Specifically, plaintiffs contend that the recycled water contract was subject to restrictions (a) requiring the SGVWC to sell recycled water for use only within the San Gabriel Valley Hydrologic Subunit, (b) precluding the SGVWC from selling recycled water to anyone other than the Los Angeles Department of Parks and Recreation except with the agreement of the Upper San Gabriel Valley Municipal Water District, and (c) requiring the SGVWC to obtain CPUC approval and comply with CPUC requirements relative to the sale of recycled water, and that these restrictions should have been addressed in the 2009 Addendum. They cite *Madera Oversight Coalition, Inc. v. County of Madera* (2011) 199 Cal.App.4th 48, 103 (disapproved on other grounds by *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 457), which held that an EIR's discussion must include a reasoned analysis of the circumstances affecting the likelihood of a water source's availability, in support of their position.

There are several problems with plaintiffs' contentions. First, plaintiffs have not shown violations of the restrictions but contend that "[t]here is no evidence in the record [to show compliance]." Again, plaintiffs disregard that, at this point in the proceedings, it is their burden to establish that the DEH acted improperly. Further, unless one assumes

27

that the SGVWC was either unaware of the limits on its authority to contract for the sale of recycled water or was willing to knowingly violate those limitations (an assumption that is not borne out anywhere in the record), the SGVWC's entry of the recycled water contract itself is evidence of the contract's validity.

In any event, substantial evidence in the record shows that the recycled water contract did not violate the restrictions that plaintiffs proffer. For example, although the applicable water reclamation requirement order included a *finding* that the proposed use area for recycled water was within the San Gabriel Valley Hydrologic Subunit at the time of its issuance,[15] that finding was not incorporated into the order's compliance terms. Moreover, although the SGVWC was required to have the Upper San Gabriel Valley Municipal Water District's consent to sell recycled water to anyone other than the Los Angeles Department of Parks and Recreation, that consent existed for sales of recycled water pursuant to the SGVWC's CPUC-approved tariff schedule, which governed its recycled water contract with GCL. Likewise plaintiffs' contention that the SGVWC could not sell recycled water to GCL outside its approved service area is baseless, as the terms of the recycled water contract provided that the SGVWC would sell and deliver recycled water to GCL at its facility in El Monte, which was within the boundaries of its territory.

---

[15] The order also incorporated a finding that "[a]dditional reuse projects may also be developed in the future."

28

Plaintiffs also assert the 2009 Addendum failed to adequately address the fact that the SGVWC recycled water contract was set to expire in five years despite the fact that the estimated lifetime of the landfill extended well beyond that time. However, the contract included the SGVWC's expression of intent to extend the contract for subsequent five- or 10-year increments. Further, the 2009 Addendum identified several factors suggesting that the SVGWC would in fact agree to an extension, including the SVGWC's commitment to provide up to 2,000 acre feet per year of recycled water to its customers (of which its commitment to GCL was just a small portion) and the substantial investment its supplier had made in constructing the pipeline through which the SVGWC received the recycled water for sale to its customers.

The DEH analyzed the potential environmental impacts, including traffic, air quality and noise, associated with the acquisition and use of 80,000 gallons per day of recycled water from the SGVWC. As the *Vineyard* decision held, the "ultimate question under CEQA, moreover, is not whether an EIR establishes a likely source of water, but whether it adequately addresses the reasonably foreseeable *impacts* of supplying water to the project." (*Vineyard, supra,* 40 Cal.4th at p. 434.) Thus, DEH answered that question and satisfied CEQA.

In sum, plaintiffs' recycled water claims are without merit.

5. *Premoisturized clay*

The 2009 Addendum relied on the use of premoisturized clay as a basis for eliminating the need for 125,000 gallons per day of water to construct the landfill liner. It further indicated that GCL planned to obtain clay from a mine that would measure the

29

elasticity of the clay and, "if necessary," would add water to the clay so that it would have the desired moisture content. It noted that GCL had a written, nonbinding proposal to purchase clay having the desired moisture content from a local mine and that there were numerous other sources from which GCL could purchase clay "throughout Southern California."

Plaintiffs challenge the sufficiency of the 2009 Addendum's analysis of water supply sources on the ground that it did not analyze the environmental impacts of GCL's use of premoisturized clay from a third party source to build the landfill liner. However, "[t]he purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind." (CEQA Guidelines, § 15003, subd. (g).) Here, GCL had received a proposal whereby a local mine would provide it with clay with the desired moisture content, without any need for GCL to provide whatever water would be required to achieve that content. Under such circumstances, we cannot conclude that the 2009 Addendum failed as an informational document because it did not include an analysis of the impacts of *the mine company's* use of water (if any was needed) to achieve GCL's specifications. (§ 21061.1; CEQA Guidelines, § 15151 [recognizing that an evaluation of the environmental effects of a proposed project "need not be exhaustive" and its sufficiency "[must] be reviewed in the light of what is reasonably feasible"]; *City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 922.)

C. *Did the 2009 Addendum Set Forth a Sufficient Analysis of the Project's Potential Fire Safety Impacts?*

Plaintiffs contend that the 2009 Addendum also failed as an informational document because it ignored the potential significant fire impacts identified in County Fire's February 2011 comments about the Project. In those comments, County Fire indicated that the "[P]roject will have a potentially significant impact on [its] delivery of emergency fire suppression, fire prevention and EMS services . . . ," that it did not expect to have fire protection facilities adequate to serve the Project within the next five years, but hoped to have a "full service, staffed fire station in the area at some time in the future" and that, in the interim, it would require GCL to participate in a community facility district or enter a developer agreement to mitigate the Project's impact on fire-related services.[16]

Plaintiffs' contention is unavailing. The 2003 FEIR set forth an extensive discussion of the potential fire safety impacts of the Project and concluded that, based on the mutual aid agreements in place at that time and other mitigating conditions, those impacts were not significant. Because the 2003 FEIR's analysis and conclusion in this regard were never challenged, it is conclusively presumed to comply with the provisions of CEQA. (§ 21167.2.) Moreover, substantial evidence in the record establishes that the 2009 Addendum did not ignore the fire safety impacts identified in County Fire's comments , but in fact incorporated a number of the suggested elements or alternative

---

[16]     It bears noting that more than four years have elapsed since County Fire submitted these comments.

elements designed to accomplish the same result as suggested elements, including a requirement that GCL participate in a community facility district or enter into a developer agreement prior to the commencement of landfill construction.[17]

The authorities cited by plaintiffs do not support a contrary conclusion. For example, while they cite *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342 for the proposition that "the burden is not on the objectors to show that a project will cause a significant effect on the environment" (*id.* at pp. 384-385), they neglect to take into account that the question at issue there was whether the objector had adequately raised the alleged effect of the Project in the administrative proceedings. Although the issue of exhaustion of administrative remedies is raised as to plaintiffs' Waste Act claims (see discussion, post), it has no bearing on the

_____

[17]    A joint technical document prepared by GCL's technical consultants considered the Project's fire protection services and determined them to be sufficient. It recited the relevant circumstances, including (1) the Project's maintenance of a firebreak between the landfill and the undisturbed natural areas surrounding it, (2) the maintenance of a minimum clearance of 150 feet from the periphery of any exposed flammable solid waste, (3) a protocol for placement of refuse within a 150 foot perimeter, including the clearance of brush and vegetative debris from around the active disposal area and the regular placement of soil cover so that no refuse would be exposed for more than four hours. The document also detailed other onsite measures analyzed in the 2003 FEIR, including the provision of fire extinguishers in facilities and on equipment, the Project's gas recovery system and the waste cover limits built into the Project, as well as the availability of trained site personnel to help suppress wildfires and to work with area fire protection agencies, including County Fire, the California Department of Forestry and Fire Protection, the North County Fire Protection District, and the Pala Reservation fire station, pursuant to existing reciprocal aid agreements. The document also specified that the Project adhered to fire prevention measures that complied with current local fire code standards.

adequacy of the 2009 Addendum's discussion of the fire and safety impacts of the Project.

Plaintiffs' contention that the DEH ignored County Fire and its comments is not supported by the record.[18]

### III. *PLAINTIFFS' WASTE ACT CLAIM*

The trial court rejected plaintiffs' claim that the DEH's issuance of the SWFP violated the Waste Act on the ground that they failed to appeal that action to the local solid waste hearing panel or CalRecycle and thus failed to exhaust their administrative remedies as to that claim. Plaintiffs contend they were not required to undertake such an appeal before seeking judicial review because Pala had already appealed the DEH's determination that the SWFP application was complete and correct and CalRecycle rejected that appeal. We disagree.

Where an administrative remedy is provided by statute, a prospective claimant must exhaust that remedy by seeking relief from the administrative body before filing a lawsuit. (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 321.) Thus, the exhaustion of available administrative remedies is a "'jurisdictional prerequisite to resort to the courts'" (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 70, italics

---

18      Plaintiffs make a related argument that County Fire's February 2011 comments constituted significant new information triggering the need for additional CEQA review. However, as noted above, the 2003 FEIR's finding of no significant fire safety impacts is conclusively presumed correct and in any event County Fire's comments did not reflect a change or new information that resulted in a significant effect on the environment so as to require major revisions to the 2003 FEIR. (CEQA Guidelines, § 15162.)

omitted), even if the statutory mandate "is couched in permissive language." (*Yamaha Motor Corp. v. Superior Court* (1986) 185 Cal.App.3d 1232, 1240.) The purpose of the statutory exhaustion requirement is to facilitate the development of a complete record drawing on an agency's administrative expertise and thus promote judicial efficiency as a result of the "preliminary administrative sifting process." (*Ibid*.)

The Waste Act sets forth a comprehensive scheme for solid waste management in California. (*San Elijo Ranch, Inc. v. County of San Diego* (1998) 65 Cal.App.4th 608, 613.) In relevant part, it requires that a person who seeks to challenge the issuance of an SWFP request a hearing before the local solid waste hearing panel or CalRecycle before filing litigation. (§§ 44307, 44310, 45030, subd. (a), 45040; see generally *San Elijo Ranch, Inc., supra,* at p. 613.)

Although plaintiffs contend that they were not required to appeal the DEH's issuance of the SWFP to the independent local solid waste hearing panel or CalRecycle because Pala asserted substantive challenges to the SWFP in its appeal of the DEH's determination that the SWFP application was complete and correct, they cite no persuasive authority for this contention. Further, their alternative assertion that, even if they would have otherwise been required to pursue administrative remedies provided in the Waste Act, doing so would have been "futile and unnecessary" because CalRecycle had already rejected Pala's substantive challenges to the permit's terms is also without merit. (See *Farahani v. San Diego Community College Dist.* (2009) 175 Cal.App.4th 1486, 1497 [recognizing that a party is excused from exhausting applicable

administrative remedies where the reviewing agency has already rejected the party's claim or announced its position on the claim].)

CalRecycle did not reject Pala's substantive challenges to the SWFP on their merits, but as inconsistent with the scope of completeness review. As the CalRecycle decision explained, a completeness determination merely reflects a conclusion that the regulatory agency has "all of the documents it needs to proceed with its review," so as to trigger the commencement of the actual permit review timeline. It does not entail a "*review of whether . . . the substance of the application is approvable*." (Italics added.) Because CalRecycle did not review the merits of the issuance of the permit, plaintiffs did not establish that pursuit of administrative remedies was either futile or unnecessary. (*Howard v. County of San Diego* (2010) 184 Cal.App.4th 1422, 1430.)

The trial court correctly concluded that plaintiffs' failure to request a hearing before the local solid waste hearing panel or CalRecycle to challenge the issuance of the SWFP bars them from seeking relief under the Waste Act.

DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

NARES, J.

WE CONCUR:

HUFFMAN, Acting P. J.

McINTYRE, J.

35